## DAVIDSON v. LAUGHLIN.*

### L. A. No. 949; March 5, 1902.

#### 68 Pac. 101.

**Work and Labor.**—In an Action for Services Rendered in Supervising the construction of a building, evidence examined, and held not to show that plaintiff's agreement to work for $60 per month prior to the completion of the building, and until the tenants began to pay rent, was conditioned on his permanent employment by defendant thereafter at $150 per month.

**Work and Labor—Agreement for Permanent Employment.**—Under Civil Code, section 1999, providing that an employment having no specified term may be terminated at the will of either party on notice to the other, except where otherwise provided by law, an agreement to give a party "permanent" employment may be terminated at any time.

APPEAL from Superior Court, Los Angeles County; J. W. Mahon, Judge.

Action by A. N. Davidson against Homer Laughlin. Judgment for plaintiff and defendant appeals. Reversed.

Russ Avery and Bicknell, Gibson & Trask for appellant; J. S. Chapman for respondent.

VAN DYKE, J.—The action was brought as upon a quantum meruit for services rendered by the plaintiff to the

---

*For subsequent opinion in bank, see 138 Cal. 320, 5 L. R. A., N. S., 579, 71 Pac. 345.

defendant at his request in negotiating the exchange and purchase of certain real estate in the city of Los Angeles, supervising the construction of the six-story brick building erected by defendant in said city, and in hiring and discharging laborers, paying bills, and acting generally as the agent of said defendant, between the first day of October, 1896, and the twenty-sixth day of July, 1898; and it is alleged that said services were reasonably worth the sum of $3,550, and that only $500 of the same had been paid. In the second count of the complaint it is alleged that after the said plaintiff had been in the employ of the defendant for some time, and while the said six-story building was in process of construction, in consideration of the defendant's promising to employ the plaintiff permanently as the agent of said defendant in the management of said building, and collecting the rents and attending to the repairs thereof, the plaintiff agreed to accept the sum of $60 per month for his services prior to the time that the tenants of the building began to pay rent, and that after such tenants began to pay rent he would accept permanent employment at the rate of $150 per month; and it is further alleged that the tenants did begin to pay rent for portions of the building the 1st of July, 1898, but that defendant did not perform his agreement and employ the plaintiff permanently in the management of said building as the agent of defendant, but, on the contrary, without any cause or excuse whatever, on the twenty-fifth day of July, 1898, discharged the plaintiff and refused to permit him to perform any services as the agent of said defendant in the management or control of said business, and that the plaintiff was damaged by the nonperformance of said contract by the defendant in the sum of $3,050. After certain denials, the defendant sets up in his answer that the plaintiff and defendant entered into an express contract on the twentieth day of June, 1897, whereby the defendant agreed that, in consideration of the plaintiff giving at least three-fourths of his time in the performance of any services defendant might require, the defendant would give the plaintiff the sum of $60 per month from the first day of May, 1897, until the said six-story building should be erected and finished, and that after its completion the defendant would pay plaintiff at the rate of $150 per month until the defendant should take entire charge of the building. The court

finds that the services rendered by the plaintiff up to the first day of May, 1897, were paid by the defendant, and that the reasonable value of the services of the plaintiff for the defendant in and about the matters alleged in the complaint from the first day of May, 1897, to and including said twenty-fifth day of July, 1898, is the sum of $150 per month, amounting in the aggregate to $2,225, $500 of which had been paid, leaving a balance of $1,725, for which judgment was rendered in favor of the plaintiff. The court also found that the plaintiff, in consideration of the defendant's promising and agreeing to employ him permanently as his agent in the management of said building, at the rate of $150 per month, after the tenants of said building began to pay rent, agreed to accept the sum of $60 per month for services for the defendant up to the time the tenants began to pay rent. The court also finds that the tenants began to pay rent on the twelfth day of July, 1898, but that said defendant did not perform his agreement to employ the plaintiff permanently in the management of said building, but, on the contrary, on the twenty-fifth day of July, 1898, without any reasonable or lawful cause or excuse whatever, discharged plaintiff from his employment. The appeal is from the judgment and from the order denying defendant's motion for a new trial. The main points relied upon by appellant are that the findings are not supported by the evidence, and that the decision is against law.

1. The evidence bearing upon the agreement referred to between the plaintiff and defendant in reference to the services of the plaintiff consists of the testimony of plaintiff and defendant themselves. The plaintiff testifies on that point that about the 1st of June, 1897, before the building was completed, the defendant was in Los Angeles, but was about to return east to attend to his business there, and says: "So I met him down there, and asked him what arrangements he had made for paying contracts that would become due while he was away. The reason I asked him that was that he had spoke of going to the First National Bank and making arrangements, but he had not been there, and he handed me a letter addressed to the First National Bank, and said that would fix it. He hadn't had time to go down there. And I said to him, 'What do you want me to do, Mr. Laughlin?' 'Well,' he said, 'I want you to look after

the paying of the bills, and such things as that.' He said, 'I have hired Mr. Parkinson, and have made arrangements with Mr. Parkinson as architect, and Mr. Parkinson has agreed to furnish a superintendent, and sometimes there will be very little for you to do—probably not more than a half or three-quarters of your time; and what are you going to charge me for your services?' I said, 'Mr. Laughlin, that would be conditional; that is, if you want me to take charge of the building after it is finished, I will do it cheaper than I would if you were going to be here and take charge of it yourself.' He said he could not be here not to exceed half of the time, that he had his eastern business to look after, and that he would want a responsible man to look after his property in Los Angeles after it was finished, and wanted to know what I would charge. I told him I would charge $150 a month for looking after his property after it commenced to take in rent. He said that was satisfactory, 'and what will you charge me until that time?' Mr. Laughlin went on to say that he was out—that it would be all outlay and no income, and that he was under a great deal of expense, and, as I would have very little to do for a great deal of the time, that to make it reasonable; and I said, 'In consideration that you hire me for your agent after the building is completed, you can state your own price. Whatever is satisfactory to you is satisfactory to me.' And he said, 'No; I would rather you would name the price.' I says, 'All right. Make it $75'—$75 per month. He said that was satisfactory, and the $150 per month was satisfactory. And then he counted up, apparently from that time, to see how long it would take before the building would be finished, and he estimated ten months. That was longer than the contracts run, but we thought it would be later, and he said, 'Well, suppose we call it $600, or $60 a month.' I says, 'All right, and, in consideration that I have the agency of the building at $150 per month, that is perfectly satisfactory to me.' That is the last we ever said about those things. We talked about other matters—what we should do—and I went on and acted on that.'' The defendant's testimony is, in substance, as follows: "A little before I left for the train, Mr. Davidson came down with his buggy that evening to take me to the station, and there was a good many details talked there on the eve of my going, and I said: 'How much of a salary,

now, for assisting in this matter, Mr. Davidson? You know that I have employed Mr. Parkinson. He is the architect. We have a superintendent of construction, but I want a little beyond that. I want something a little beyond that— that when I happen to be away that we can look a little more closely than is looked into buildings generally. There may be some little bills to look after, some accounts to take, and so forth; and how much salary do you want a month?' 'Well,' he said, 'it ought to be worth $75 a month.' I replied, 'Mr. Davidson, I don't think it is worth $75 a month for all that is to do.' 'Well,' he said, 'how much do you think it ought to be?' I said: 'Mr. Davidson, I won't fix the price. I would rather you would fix your own price, and be satisfied with it, if you go into this business'—and stated at the same time that during the construction of the building for a long time there wouldn't be any income from the building, and that after the building was filled there would be something to get salary from; and he said, 'How would $50 or $60 a month be?' 'Well,' I said, 'we will let it go at $60; and, while there has been very little done previous to date that you have had anything to do, yet the first of our work runs back to the 1st of May, and we will call it from the 1st of May to the completion of the building'—the 1st of May, 1897. It was only a month or so we go back; and that is something that Mr. Davidson has overlooked, as he stated his wages were to begin on the day we talked; but it was to go back to that date, and he was to get more than that. He was to get paid from the 1st of May up to the completion of the building at the rate of $60 a month. 'Well,' he says, 'how about after the building is built?' 'Now, Mr. Davidson,' I says, 'that is a thing I don't know anything about, hardly. My environment in Ohio is such that it may be quite a while before I can dispose of my house. I may come here in a few months with my family, and it may take two or three years.' 'Well,' he says, 'can I have the building after it is completed?' 'Mr. Davidson,' I says, 'I have got to get somebody, and, for the moment, I don't know anybody better than you, and I can't see why I should get anybody else.' 'Well,' he says, 'if you feel that way, I will accept the $60 a month until it is completed.' 'Now,' I said, 'Mr. Davidson, I don't know. This is a thing we don't know. If I am a nonresident, and not here, it is worth $150

a month for a man to assume the whole responsibility and take charge of that; it is worth all you ask; and I don't know anybody better than you are to do the business; but I won't bind myself, because I don't know what will happen.' Times then were a little dull. It was most difficult to sell property, and I had a most expensive residence in East Liverpool, Ohio, that I wanted to dispose of, and they are slow sale anywhere; and I had at that time owned the entire factory myself, and I had other interests there that were not simply money interests—interests that took my personal time, and as long as that held it would require my son and me both. 'But we will let that take care of itself when we get to it. I don't know anything about it. If I don't come here, and everything goes smoothly, I can't see anything in the way of your continuing, after the building opens and we begin to get rent, at $150 a month.' He said: 'That is all right. I know men may die and things may change. We can't tell. We can't have permanent employment—absolutely permanent.' '' The services of the plaintiff prior to the first day of May, 1897, according to the findings of the court, were fully paid and settled, and it is not necessary to consider that part of the claim. From that time and during the construction of the building, in view of the fact that only one-half or three-fourths of the time of the plaintiff would be required, it seems to have been agreed that he should have the sum of $60 per month. It is very clear from the testimony of the plaintiff and defendant—and that is all there is bearing upon the contract between the two parties—that there was no fixed and definite agreement in reference to the term of employment after the building should be completed and tenants commenced to pay rent, and it does not support the theory of the respondent that the agreement to pay $60 per month prior to the completion of the building was conditioned upon the permanent employment with the defendant thereafter at $150 per month. The plaintiff testifies: ''In consideration that you hire me for your agent after the building is completed, you can set your own price. What is satisfactory to you is satisfactory to me.'' The defendant, according to the plaintiff himself, did not agree to that proposition, but replied: ''No; I would rather you would name the price.'' Then he went on to state that during the construction of the building there would be very little for the plaintiff to do; that it

would not occupy more than half or three-fourths of his time; and under such circumstances they agreed to call it $60 a month for that period. As to an arrangement after the building should be completed, from the testimony itself given by the respondent, it appears that it depended upon contingencies. "He said he could not be here to exceed half the time, that he had his eastern business to look after, and that he would want a responsible man to look after his property in Los Angeles after it was finished"; implying from the whole of the testimony that when he or his son, as a substitute, should be here to look after the property, he would not require an agent. The plaintiff himself does not testify that the employment after the completion of the building should be permanent, although the court find such to be the fact. But even if the agreement should have been for permanent employment, as claimed by plaintiff and found by the court, this would not mean employment during life or as long as the plaintiff might desire, but it simply means for an indefinite term; and an employment having no specified term may terminate at the will of either party, on notice to the other: Civ. Code, sec. 1999. The agreement for the $60 a month, however, was for an ascertained, definite period (that is during the construction of the building and until tenants commenced to pay rent), and this was an independent and distinct agreement; and, owing to the fact that only half or three-fourths of the plaintiff's time was required, the compensation agreed upon would seem to be reasonable, without regard to future contingencies. About the time the building was completed, defendant, by power of attorney, appointed his son, who was then in Los Angeles, as his agent in the management of his business there while he was detained in the east. A controversy or quarrel soon arose between Laughlin, Jr., and the plaintiff about the management of the building, in reference to which the latter testifies: "I could not say just what I said to him, but I probably gave him to understand that I never had considered he was in charge of the building. Mr. Laughlin never had told me that he would be in charge. The fact is, Mr. Laughlin went away, I supposed, leaving me in charge of the building. He left about the 9th or 10th of July, and my recollection is that the power of attorney was made on the evening of the 9th of July, and up to that time Mr. Laughlin, Sr., had not said anything

about any changes in his relations with reference to the building.'' The finding that the plaintiff was discharged by the defendant without any reasonable or lawful cause or excuse is not supported by the evidence.

2. Even if the terms of the agreement had been that the employment, from the time tenants began to pay rent, should be ''permanent,'' that would not, as a matter of law, have deprived either party of the right to terminate the employment at any time: Civ. Code, sec. 1999. ''Permanent employment,'' as defined by Bouvier, means ''employment for an indefinite time, which may be severed by either party'': Law Dict., tit. ''Permanent Employment.'' In Lord v. Goldberg, 81 Cal. 596, 15 Am. St. Rep. 82, 22 Pac. 1126, the plaintiff entered the defendant's employment as solicitor for customers for groceries, at a salary of $20 per week. The salary was to increase in proportion to the new business brought in. The plaintiff hesitated to accept the position unless assured that it would be permanent, and the defendant replied, ''It will be permanent,'' and signed a written statement saying, ''His position is permanent, so long as he desires to make it so.'' Plaintiff remained in the employment of the defendant five months, and, as his salary was greater than the increased profits of the business, defendant offered a lower scale, which plaintiff declined, and their relations were thereupon severed without further negotiations. This court, in passing upon the case, held that the finding of the court that he was wrongfully and without just or reasonable cause dismissed from the employment was not supported by the evidence, and adds: ''But, however this may be, it is clear that plaintiff's employment was not intended to be for life, or for any fixed or certain period. It was to be 'permanent,' but that only meant that it was to continue indefinitely, and until one or the other of the parties should wish, for some good reason, to sever the relation.'' In Perry v. Wheeler, 12 Bush, 541, the plaintiff was elected permanent rector of a church, but was afterward, as he claimed, wrongfully dismissed. The court said: ''Appellant, by his counsel, insists that he was the permanent rector of Grace church, and had the right to retain his position during life, unless he should become incapacitated for the performance of clerical duties by age or disease, or unless he should disqualify himself by immoral or unchristian conduct, or by the abandon-

ment of the faith and practices of the Protestant Episcopal church. He certainly was elected permanent rector, but we do not understand the term 'permanent,' as used in this case, to mean that the parties were to be bound together by ties to be dissolved only by mutual consent, or for sufficient legal or ecclesiastical reasons. We understand that Dr. Perry was called as the rector of the church for an indefinite period, and that it was intended he should continue to hold the place until one or the other of the contracting parties should desire to terminate the connection, in which case the dissatisfied party was to have the right to be relieved of further obligation to the other, upon fair and equitable terms, and after reasonable notice.'' In Elderton v. Emmens, 4 Com. B. 478, it was claimed that the plaintiff was retained and employed as a permanent attorney and solicitor of the defendant company, and had been wrongfully discharged. But it was held that the word ''permanent,'' as used in the resolution of appointment, denoted no more than a general employment, as contradistinguished from an occasional or special employment. Therefore, if the agreement had been that the employment should be permanent after the tenants commenced paying rent, as claimed by appellant, it was subject in law to be terminated at the pleasure of either party; and the termination of the employment was not, therefore, a breach of the contract, and the decision of the court on this point is contrary to law.

The court finds that before the commencement of the action the defendant tendered to the plaintiff a sufficient sum, together with what had been previously paid him, to cover all the indebtedness due from defendant to plaintiff for services rendered after the first day of May, 1897, at the rate of $60 a month, up to the time the tenants commenced paying rent, and at the rate of $150 per month thereafter, and that subsequently the sum so tendered was paid into court.

For the foregoing reasons the judgment and order are reversed and the cause remanded, with directions to the court below to enter judgment in favor of the plaintiff for the sum so paid into court, but without costs.

We concur: Harrison, J.; Garoutte, J.