CHIEF JUSTICE LINDSAY
delivered the opinion oe the court.
The contract between the Rev. G. B. Perry, D. D., and the wardens and vestry of Grace Church, at Hopkinsville, Kentucky, is evidenced by the following papers:
Hopkinsville, ICy., Sept. 1, 1867.
“ Rev. G. B. Perry, D. D.:
“Dear Sir — By the unanimous vote of the members of Grace Church, Hopkinsville, taken at a meeting held on Thursday last, the vestry were authorized to submit the following to your consideration:
“ Be it Resolved, and hereby it is resolved, that the Rev. G. B. Perry, I). E>., be and hereby is elected permanently to the rectorship of Grace Church, Hopkinsville, at a salary of-dollars per annum, to be paid quarterly, each quarter respectively, in advance, with the free use also of rectory grotmds, as soon as vacated by present occupant.
*545 “Resolved, That said blank in regard to salary be hereafter filled.
“In submitting the above, allow me to express the hope that we may be placed at an early date in possession of a favorable reply. Very respectfully,
“Jas. Wallace, Senior Warden.
“Attest: J. L. Griffith, Seo’y.”
“ To the Wardens and Vestry oe Grace Church, Hopkinsville, Kentucky:
“Gentlemen — Your unanimous call of August 10, 1867, to become the permanent rector of Grace Church, Hopkinsville, Ky., is received. In reply, I would say that I accept the same, commencing on the first Sunday of the present month. May the blessing of Almighty God, through Christ, crown our mutual efforts to build up his kingdom and cause in the world, and this place in particular.
“Yours in Christian bonds,
“G. B. Perry.
“Hopkinsville, Ky., Sept. 10, 1867.”
“Princeton, Ky., April 28, 1868.
“To the Wardens and Vestry oe Grace Church, Hopkinsville, Kentucky:
“ My Dear Friends — My last visit to your parish has been to me a very gratifying one. I find you supplied with a rector who possesses your highest regards, affection, and esteem. I find you once more a united people, looking forward to a brighter future for your parish, and with many tokens of progress and prosperity. Will you permit me to make one or two suggestions concerning the welfare of your parish, suggested as they are by a deep interest in the success of our beloved church in your community. And, first, as to the support of your rector, I am confident that the parish is able to do much more than to raise the sum you first named to Dr. Perry, and as the blank in your letter has not yet been filled, I should earnestly advise you to fill it with at least the sum *546 of $600. It does not seem to me a large sum for your congregation to raise. The circumstances of our missionary societies are such now that I have not been able up to this time to promise a certain stipend to your parish, but if you make an earnest effort to raise the sum and find it too large, I should try to obtain enough from the missionary funds to make up the deficiency. I need not say in this and every good work you will find me a ready and earnest co-worker.
“I am, my dear brethren, most faithfully yours,
“Geo. D. Cummins,

“Assistant Bishop of Kentucky.”

This letter was received by the vestry, and at a meeting held by them May 19, 1868, the following resolution was unanimously passed:
“Resolved, That the annual salary of the rector, G. B. Perry, I). D., be not less than $600, to commence at the beginning of the church year of his settlement as our pastor.”
In August, 1871, a resolution was adopted by the vestry to the effect that for the year ending September 1, 1872, Dr. Perry should receive the sum of not less than $500. The adoption of this resolution resulted in a controversy between the rector and his congregation, and the breach continued to widen until finally application was made by persons representing the congregation to the bishop of the diocese for the appointment of a board of reference to investigate the facts and to determine whether or not it was possible to terminate the controversy; and if not, to prescribe the terms upon which a dissolution of the relations existing between the rector and the congregation should be had.
The board was appointed. It met and organized at Hopkinsville, February 7, 1872. It determined that a dissolution was necessary, and rendered this judgment or recommendation :
*547 “And we do hereby recommend that such dissolution should take effect on the 1st day of March, 1872, upon the following terms, to wit:
“ 1. That the vestry or congregation pay to Dr. Perry all arrears due on his salary up to the 1st of September, 1871, counting such salary to be $600 per annum.
“ 2. That Dr. Perry be allowed the use of the rectory and grounds attached thereto up to the 1st of June, 1872.
“ These conditions we would make mandatory. In addition to these, we would request and recommend to the vestry that they should pay to Dr. Perry at the same rate of $600 per annum up to the 1st of March, 1872, while we make it imperative that they shall pay him at the rate of $500 per annum from September 1, 1871, to March 1, 1872.
E. P. Perkins, J. M. Curtis,
R. M. Chapman, Lucien C. Lance.” '
This finding was reported to and approved by the bishop. Dr. Perry declined to surrender the rectory and grounds, and declined to acknowledge the binding obligation of the action of the “board” as construed by the bishop, and the result was his suspension from the right to exercise clerical and ministerial functions within this diocese until his alleged contumacious disobedience should cease.
Matters remained in this condition until July, 1875, when Dr. Perry instituted this action, claiming that the wardens, vestry, and congregation were indebted to him for salary due and in arrears in the sum of over $3,000, and seeking to have the rectory and grounds held and owned by the church subjected to the payment of his claim.
The facts touching the dissolution of the relationship between Dr. Perry and the congregation were set up by the defendants in their answer. It was averred that the sum of money due to Dr. Perry by the terms of the finding of the *548 board of reference had been tendered him, and that he had refused to accept the tender; and by way of cross-action they alleged that he had wrongfully withheld the possession of the rectory and grounds from the 1st day of June, 1872, up to the time at which they answered; and they prayed that he should be charged with reasonable rents therefor, and that said rents should be set off against any claim he might have for arrearages of salary. The reply of Dr. Perry raised a proper issue as to this claim. The cause was submitted and a judgment rendered requiring the appellant to surrender the rectory and grounds, and setting off rents against the sum awarded him by the board of reference, and dismissing his petition; and'to reverse that judgment he prosecutes this appeal.
Appellant, by his counsel, insists that he was the permanent rector of Grace Church, and had the right to retain his position during life,- unless he should become incapacitated for the performance of clerical duties by age of disease, or unless he should disqualify himself by immoral or unchristian conduct or by the abandonment of the faith and the practices of the Protestant Episcopal Church. He certainly was elected permanent rector; but we do not understand the term “permanently,” as used in this case, to mean that the parties were to be bound together by ties to be dissolved only by mutual consent or for sufficient legal or ecclesiastical reasons. A connection of that character might, and in some cases probably would, result in compelling an unwilling pastor to remain with his congregation, or a dissatisfied congregation to retain and pay an unpopular and distasteful minister after the feeling of estrangement had become so intense that the continuance of the pastoral relation would tend to tear down and destroy rather than to preserve or build up the cause of Christianity and the moral and religious interests of the local church.
We understand that Dr. Perry was called as the rector of the church for an indefinite period, and that it was intended *549 he should continue to hold the place until one or the other of the contracting parties should desire to terminate the connection, in which case the dissatisfied party was to have the right to be relieved of further obligations to the other, upon fair and equitable terms, and after reasonable notice, and with the concurrence or approval of the ecclesiastical authority of the diocese.
Appellant denies that he is in any way bound by the action of the board of reference. That board was composed of but four of the five presbyters appointed, and he insists that by the canons of the Protestant Episcopal Church the presence and participation of five members is indispensably necessary to constitute a legal and constitutional tribunal of that character
Upon the other hand, it is claimed that this is not a proper question for the consideration of. the secular courts; that they have no right to inquire whether an ecclesiastical tribunal has exceeded its lawful powers; and that the action of one of these tribunals is conclusive, in a legal controversy, not only as to the merits of the question it may have decided, but also as to its power and jurisdiction over the subject matter of the dispute and of the parties concerned, until such action shall have been reversed, annulled, or modified by some higher church judicatory.
This is not a new question in this court. The rule by which the legal tribunals are guided in cases of this character was thus stated in the case of Watson v. Avery (2 Bush, 332): “While we recognize the principle as firmly and correctly established that civil courts can not and ought not to re-judge the judgments of spiritual tribunals as to matters within their jurisdiction, whether justly or unjustly decided, we can not accept as correct the principle contended for in argument for the appellees, that whether the synod had jurisdiction and power over the subject on which it acted, under the presbyterial system, is a *550 question purely ecclesiastical, to be settled by the synod itself and the general assembly. Such a construction of the powers of church tribunals would, in our opinion, subject all individual and property rights confided or dedicated to the use of religious organizations to the arbitrary will of those who may constitute their judicatories and representative bodies, without regard to any of the regulations or constitutional restraints by which, according to the principles and objects of such organizations, it was intended that said individual and property rights should be protected ;” and that “ when rights of property, which are secured to congregations and individuals by the organic law of the church, are violated by unconstitutional acts of the higher courts, the parties thus aggrieved are entitled to relief in the civil courts as in ordinary cases of injury resulting from the violation of a contract or the fundamental law of a voluntary association.”
This rule was again announced and elaborated in the case of Gartin v. Penick (5 Bush, 110).
But our attention is called to the fact that the doctrine of these cases was rejected and repudiated by the Supreme Court of the United States in the case of Watson v. Jones (13 Wallace, 679).
There are various reasons why we should not allow the rules of property or of individual rights, under the protection of the laws of this state, to be shaped and controlled by the principles of that opinion. The then Chief Justice and Mr. Justice Nelson did not participate in the consideration or the decision of that case, and the jurisdiction of the federal judiciary was denied by Justices Clifford and Davis, and their position is sustained by the weight of authority.
Then we deny without qualification the right of the federal courts to set up and enforce within the territorial limits of Kentucky a rule of property affecting title to real estate different from and subversive of the laws of this commonwealth *551 as construed and expounded by this court. The constitution of the Supreme Court of the United States “requires it to follow the laws of the several states as rules of decisions whenever they apply, and the habit of the court has been to defer to the decisions of their judicial tribunals upon questions arising out of the common law of the state, especially when applied to the title to land.” (Beauregard v. New Orleans, 18 Howard, 502.)
And in the case of Gelpcke v. City of Dubuque (1 Wallace, 177), where this rule was not observed, the court felt constrained to say: “We are not unmindful of the importance of uniformity of the decisions of this court and those of the highest local courts, giving constructions to the laws and constitutions of their own states. It is the settled rule of this court to follow the decisions of the state courts.” And the reason why the decision of the Supreme Court of Iowa was not followed in that case was because that court had changed its opinion as to the constitutionality of certain state legislation, and thus destroyed the alleged rights of parties who had contracted upon the faith of an elder and different opinion.
And even under that state of facts, Mr. Justice Miller declared in a dissenting opinion, after a full and careful review of all the cases, that the advance then taken by the supreme court was in the direction of a usurpation of the right belonging to the state courts to decide as a finality upon the construction of state constitutions and state statutes.
The questions involved in the case of Watson v. Jones affected the title to and the use of real estate, and were dependent upon the proper construction of the statutes and the common law of this state. They had been fully investigated and finally decided by the state courts, and the effect of the majority opinion of the supreme court in that case was to approve a re-trial of the same issues between substantially the *552 same parties, and of the rejection of the construction of the laws of this state adopted by its own courts, and of the practical reversal by the federal circuit court of the decision of the highest judicial tribunal of a sovereign state.
And it was not attempted to justify or excuse this departure from the precedents of the supreme court by showing the existence of any single fact deemed sufficient to constitute an exception to the general and well established practice of that court.
Under these circumstances it was not to be expected the majority opinion in the case of Watson v. Jones would become a controlling precedent. And we very soon find the supreme court returning, and (except in a few professedly exceptional cases), afterward steadily adhering to the ancient and almost universal rule that the decisions of state tribunals as to the true construction of their own laws are binding upon the federal judiciary. (Walker v. State Harbour Com’rs, 17 Wallace, 648; Galpin v. Page. 18 Ibid, 350; Bailey v. Magwire, 22 Ibid, 215; and Secombe v. The Railroad Co. 23 Ibid, 108.)*
And it will also be seen by an examination of the case of Bouldin v. Alexander (15 Wallace, 131) that the supreme court substantially abandoned the ruling in Watson v. Jones as to the power of secular courts to pass upon the jurisdiction of bodies of persons claiming to act as ecclesiastical courts, and actually inquired into the constitution and manual of the Baptist Church, and decided as matter of church law that the minority of the members of a Baptist congregation have no power, under the constitution of that church, to remove trustees from office, or to exclude other persons from membership; and finally, that the attempted exscinding of the majority of the members by the minority, who were in the possession of the church edifice, and who claimed to constitute the true body of the church, was wholly inoperative and void; and as to the removal of the trustees, the court said the attempt was a nullity *553 because it is “certain that they can not be removed from their trusteeship by a minority of the church society or m'eeting without warning, and acting without charges, without citation or trial, and in direct contravention of the church rules.”
It is thus made plain that the federal court looked into the constitution and rules of the church, and decided against the ecclesiastical power of this minority to remove trustees, just as this court examined the constitution of the Presbyterian Church and decided that the synod and general assembly had no ecclesiastical power to make valid and binding the irregular and unauthorized action of certain members of the Walnut Street church in the appointment of ruling elders, who were to participate in the management and control of the property and temporalities of that congregation, by proceedings unknown to and impliedly prohibited by the fundamental law of the general church.
It is true that in Bouldin’s case the supreme court intimates there is a difference between churches having a general organization, with ecclesiastical tribunals possessing certain general and ultimate powers of control, and churches where the congregations are strictly independent of their ecclesiastic associates. But this difference does not authorize the application to the one class of churches of a principle radically antagonistic to that applied to the others.
The Congregational churches and their members are as free from and as independent of secular control as the churches held together by general organizations; and if the shadowy distinction under consideration does not owe its prominence to the necessities of the case of Watson v. Jones, it certainly can not be sustained on principle; and it is here proper to remark that the intimation contained in the opinion of the majority in that case that the three learned and upright members of this •court concurring in the decision in the case of Watson v. Avery were capable, under cover of inquiring into the juris *554 diction of the Synod and General Assembly of the Presbyterian Church, of retrying the merits of the controversy, and substituting their own for the judgment of those ecclesiastical tribunals, is wholly gratuitous, and no more supported by the facts of the cáse than that insinuation is “suited to the dispassionate dignity ”* of the Supreme Court of the United States, or “respectful to another court of at least concurrent jurisdiction over the matter in question.”*
We are satisfied the difference in the organization of the various churches can work no difference in the principle by which legal tribunals are to be governed when required to deal with the action of ecclesiastical bodies, and we do not doubt our power to inquire into the organization of the board of reference, and to decide whether it acted without the scope of its constitutional jurisdiction.
It was called into existence and organized, and acted under the provisions of sections 1 and 2 of canon 4, title 2 of the Digest of the Canons of the Protestant Episcopal Church in the United States. Said canon provides as follows:
Section 1. “In case of a controversy between any rector or assistant minister of any church or parish which can not be settled by themselves, the parties, or either of them, may make application to the bishop of the diocese, who shall thereupon notify each of the contesting parties to furnish him with the names of three presbyters in the diocese. The bishop shall add to them the names of three other presbyters, and the whole number shall then be reduced to five by striking off the names alternately, by each of the contesting parties. Should either party refuse or neglect to name three presbyters, or to strike from the list, as aforesaid, the bishop shall act for the parties so refusing or neglecting; and in all the proceeding aforesaid the vestry or congregation, as the case may be, shall be represented by some layman of their number, duly selected r, *555 by them for the purpose, provided that the party or parties applying as above shall have first given the bishop satisfactory assurance of compliance with whatever may be required of them as the final issue of such proceedings.”
Sec. 2. “ The five presbyters thus designated shall constitute a board of reference to consider such controversy; and if, after hearing such allegations and proofs as the parties may submit, a majority of the presbyters shall be of opinion that there is no hope of a favorable termination of such controversy, and that a dissolution of the connection between such rector or assistant minister and his parish or congregation is necessary to restore the peace of the church and promote its prosperity, such presbyters shall recommend to the bishop that such minister shall be required to relinquish his connection with such church or parish, on such conditions as may appear to them proper and reasonable.”
Appellant insists that the proceedings to be had before a board of reference are in the nature of an arbitration, that the members of the board are arbitrators, and that the submission of the matters in dispute being to the five members jointly, they must all act together, and must each and all be present and participate from the commencement to the conclusion of the proceedings.
The board differs in many regards from a board of arbitrators. It is an ecclesiastical court provided for by the laws of the church, and the parties can not defeat its action by refusing or declining to submit themselves to its jurisdiction. It is charged with the duty of settling a question of church policy, and its recommendations to the bishop as to the legal rights of the parties rest upon, and are incident to, its primary power to determine whether the connection between the rector and the parish should be dissolved. In passing upon the primary and purely ecclesiastical question the board is a church court, and in no sense a board of arbitrators. But if, *556 upon general principles, we had a doubt as to the proper constitution of the board, that doubt would be removed by the provision of title 3, canon 7, that “in all cases in which a canon of the general convention directs a duty to be performed or a power to be exercised by a standing committee, or by the clerical members thereof, or by any other body consisting of several members, a majority of said members, the whole having been duly cited to meet, shall be a quorum, and a majority of that quorum so convened shall be competent to act, unless the contrary is expressly required by the canon.”
This provision includes boards of reference, and the canon providing for their constitution'and organization does not expressly, or even by fair implication, require that all of the five members shall act.
We conclude that the board acting in this case was legally organized, and that it kept within the scope of its powers, and hence that its recommendations, approved, as they have been, by the bishop of the diocese, must be respected by the civil tribunals.
Another objection urged to the action of the board is that the canon under which it was appointed was not adopted by the general convention of the church until after Ur. Perry had entered into his contract with Grace Church.
This canon was not intended to and does not operate to give either of the parties a new, nor to take from either an existing right. It is in the nature of a remedial statute, and merely prescribes the manner in which the existence of the facts authorizing a dissolution of the connection between a rector and his congregation .shall be ascertained, and the terms and conditions of the dissolution fixed and determined.
As we have already seen, the right of the contracting parties to have this relief existed from the beginning, and grew out of the very nature of their contract, and it seems manifest that in adopting this canon the convention exercised *557 only a reasonable, necessary, and unquestionable ecclesiastical power.
It was the duty of Dr. Perry to surrender the possession of the rectoxy and grounds on the 1st day of June, 1872, and the failure of the appellees to pay him the arrearages due on his salary did not excuse him from the performance of that duty. The dissolution of the pastoral connection and the surrender of the church pi’operty were not made to depend upon the performance by the congregation of the duties imposed upon it by the board of reference.
The tender of the arrearages of salary to appellant was not good in law, and did not stop the accrual of interest; but as the reasonable rents of the property wrongfully withheld by the appellant greatly exceed in amount the principal of the sum due him, with its accrued interest, we need not discuss that question.
The court below did not err in setting off the rents against the claim for salary, nor in requiring the appellant to surrender the possession of the rectory and grounds. ,
Wherefore its judgment must be affirmed.

 See also United States y. Rox, decided, by U. S. Supreme Court, April 16,1S77.

 Dissenting opinion of Justice Miller, 1 Wallace, 209.