SULLIVAN *v.* DETROIT, YPSILANTI & ANN ARBOR
RAILWAY.[1]

| 135 661 |
| 146 557 |

1. CONTRACTS—CONSTRUCTION—PERMANENT EMPLOYMENT.
   A contract to make a person the permanent attorney of a railroad company is satisfied by his employment as such, at a fixed salary, for the period of one year.

2. CORPORATIONS—LIABILITY ON CONTRACT WITH PROMOTERS.
   The question of the liability of a corporation, as upon an implied contract, to pay for services rendered under an express contract with its promoters, is discussed, but not decided.

Error to Wayne; Carpenter, J. Submitted April 7, 1903. (Docket No. 2.) Decided March 8, 1904.

*Assumpsit* by J. Emmet Sullivan against the Detroit, Ypsilanti & Ann Arbor Railway for services rendered. From a judgment for plaintiff, defendant brings error. Reversed.

Some time in the summer or fall of 1897, three men, Messrs. Russell, Angus, and Liggett, entered into a scheme for the organization of an electric railway to run from Detroit to Ann Arbor. There already existed a street railway in Ypsilanti, another in Ann Arbor, and a third between those two cities. The scheme was to unite those three, and extend the road to Detroit. Plaintiff was an attorney at law in the city of Detroit, and had been engaged in practice for about 11 years, the first 3½ years of which he was a clerk in the law office of Hon. Don M. Dickinson, and after that engaged in practice by himself or in partnership with others. He was known to Mr. Russell, one of the promoters. It was deemed necessary to have legal advice and the services of an attorney in preparing and drawing papers. Plaintiff claims that the

---

[1] Rehearing denied July 27, 1904.

three original promoters agreed to employ him. The agreement rested in parol, and, as stated by plaintiff, is as follows:

"Mr. John A. Russell came to me first, and told me of the enterprise they had on hand, which was to build a road between Detroit and Ann Arbor, and told me that Mr. Angus and Mr. Liggett were in with him, and wanted to know whether I could handle the law business,— what kind of an arrangement they could make. They said that they would have no bonds or stock for me, but wanted to know if I would take it on consideration of being made permanent attorney. After some consideration I said that I would, provided the expenses would be paid. Then I was introduced to Mr. Angus and Mr. Liggett by Mr. Russell, and I made an arrangement with them to the same effect,—that I was to go ahead and do all the legal business connected with this enterprise, help them to secure franchises, do anything on that line they called upon me to do until the enterprise would be a success, or in such condition it was sure of success. In the meantime I should be paid my expenses, and, if it was not a success, I was not to get any compensation; but, if it was a success, I was to be made permanent attorney of the road. * * * There was no different arrangement under which I performed these services."

Mr. Angus was introduced as a witness for the plaintiff, and testified that he did not recollect that there was any condition to the appointment of Mr. Sullivan. He further testified:

"Q. What compensation was he to receive if the project was successful?

"A. My connection with it was, would I consent to his becoming attorney for the company?

"Q. Permanent attorney, after the organization of the company?

"A. I do not recollect any permanent.

"Q. That he should be appointed attorney, you did not mean to terminate in a year?

"A. No, I had not anything special in mind as to the length of time. It did not occur to me at that time.

"Q. He was to be the regular employed attorney; that was your understanding?

"*A.* Yes, I think that I will put it that way; I think I will say it was.   *   *   *   The substance of what was said to him, to the best of my recollection, is that I would be favorable to his appointment as attorney for the company."

Mr. Liggett was produced by the defendant, and denied any such contract as is claimed by the plaintiff, but testified that his understanding from the talk with Mr. Russell was that plaintiff was doing the work for Mr. Russell. Mr. Russell was not produced as a witness. Plaintiff had no other talk with any stockholder or officer of the company in regard to his employment or this alleged contract. Under his own testimony, the contract was made with these three promoters, and was never divulged to any other stockholder or officer of the corporation until after his employment under the resolution hereinafter referred to had terminated. In his conversation with Hawks at that time he only claimed that he had made the arrangement with Angus and Russell. Mr. Russell told Mr. Hawks that he had employed Mr. Sullivan, and that his (Sullivan's) services were a part of what he (Russell) was putting into the company,—" a part of his contribution to the enterprise." Mr. Hawks received no information of any different arrangement until he received the letter of March 15, 1898, when Mr. Russell sold his stock in the company— 980 shares—to Mr. Hawks. In the letter offering to sell he said:

" Inasmuch as I have been active in securing the franchises and doing preliminary work for this company, which has necessitated the making of promises of various natures in return for assistance rendered, I desire, as a further consideration, that these promises made by me, which I will no longer be able to carry out, be composed along the following lines:

" 1. Mr. J. E. Sullivan, who did all the preliminary law work for the company gratuitously in consideration of permanent employment as attorney of the company from and after March 1st, to be guaranteed such employment for the period of one year at the rate of $1,500 per year, payable monthly."

On March 15, 1898, the board of directors, six in number, passed a resolution reading as follows:

"That J. Emmet Sullivan be employed as the attorney of this company for the period of one year from and after March 1, 1898, at an annual salary of $1,500, payable in equal monthly installments; this payment to be in full settlement of services to date and for the coming year."

At the organization of the company, November 2, 1897, four other men became stockholders of the corporation, and signed the articles of incorporation, among whom was Mr. Hawks, who afterwards became president of the company. Mr. Russell became its secretary. There were at the time of the adoption of the above resolution six directors, three of whom were Hawks, Russell, and Angus. Of these six directors only two—Russell and Angus—had any knowledge of the arrangement made with the plaintiff.

Mr. Sullivan was paid $125 per month during the year. He afterwards attended to some suits, and did some other business, for which he received $600. After the expiration of the year for which he was employed, he made claim to Mr. Hawks for $15,000 for services rendered to the company from November 2, 1897, to March 1, 1898. The company denied liability, and thereupon plaintiff brought this suit upon the common counts in *assumpsit*. He rendered no bill of items to the defendant, and his bill of particulars filed in the suit recited the services in drawing the articles of association, bond and mortgage, and other papers, giving advice, attending meetings of the directors, and negotiating the purchase from the three companies, etc., for which he claimed the lump sum of $15,000. He recovered a verdict and judgment for $9,028.12.

*Corliss, Andrus, Leete & Joslyn* (*Otto Kirchner*, of counsel), for appellant.

*Sullivan, Bland, Cook & Van Syckle* (*Elliott G. Stevenson* and *Leo M. Butzel*, of counsel), for appellee.

Grant, J. (*after stating the facts*). The theory of

the declaration and of the right of recovery in this case is that plaintiff had no express contract with the defendant, but that he rendered services for it under such circumstances that the law implies a contract, and presumes a promise by the defendant to pay for the services so rendered, and of which it has had the benefit. Plaintiff's own evidence conclusively establishes the fact that he had no contract, either express or implied, with the defendant, until the contract of employment of March 15th, but that he made an express contract with the three original promoters of the scheme to perform the services for which he now seeks to recover, upon their agreement that they should make him the permanent attorney of the company. He had no other agreement, and at no time until more than a year after the services were rendered did he make any claim to any of its officers of the contract which he now asserts was made. These promoters could make no contract for the defendant, which was not then organized. That contract could not bind the corporation until it was known to and approved by it. The knowledge of Messrs. Russell and Angus, after they became directors, was not the knowledge of the corporation. The only knowledge possessed by Mr. Hawks, its president, was that plaintiff was the personal employé of Mr. Russell. This statement did not, of course, bind the plaintiff, but shows that Hawks had no knowledge of plaintiff's alleged contract.

When, under plaintiff's version of the contract, did he begin to render services for the defendant? Certainly not until the corporation was organized. But his contract with these three promoters was that the scheme should be a success, not that the company should be organized. If the promoters had secured options for the purchase of the three companies then in existence, and franchises from the townships along the proposed line, before the organization of the company, and it had not been organized until all his services in carrying out his contract had been performed, would the corporation, with new stockholders and new directors, have been liable, either under the express

contract, or under an implied contract for his services performed under the special contract? The promoters evidently thought it wise to organize the company early as one of the means to assist in carrying out the scheme. But plaintiff performed services no more for the corporation in one case than in the other. He made his contract with the promoters. He knew he could not enforce it against the corporation. If he chose to make a contract which he could not enforce against the promoters, under *Durgin* v. *Smith*, 133 Mich. 331 (94 N. W. 1044), it is his misfortune. But whether he could enforce his contract with them is immaterial here.

The circuit judge correctly instructed the jury that plaintiff could not recover in accordance with that agreement, but instructed them that, if the plaintiff was entitled to recover at all, he was entitled to recover what his services were reasonably worth. The fatal error of the charge and of the plaintiff's theory is that he had an express contract with the promoters, which precludes any possibility of an implied contract with the corporation. Plaintiff, a lawyer, must have known that the contract could not bind the future corporation, unless, after it was formed, it knew of its existence and ratified it.

If we understand the argument of counsel correctly, it is that the defendant never ratified the contract made with the three promoters before the organization of the company, but, having received the benefit of his services rendered under that contract, the law implies a promise on its part to pay, not in accordance with the contract, but on a separate and distinct implied contract. If defendant had ratified the contract and appointed plaintiff its attorney in accordance therewith, and that was carried out for a year, and then broken by the defendant, the only remedy of plaintiff would be an action upon the contract for the breach thereof. If, as he contends, his employment was virtually for life, or for the life of the corporation, he could not, in the event of a subsequent violation of the contract by the defendant, recover upon the basis of an implied contract the

value of his services previously rendered.   After six years such claim would be barred by the statute of limitations. A contract will be implied only when no express contract exists.   If A. makes an express contract with B. to perform services for C., C. is not liable on an implied contract because he received the benefit.   The two contracts cannot exist together, governing the same transaction.

"As in physics two solid bodies cannot occupy the same space at the same time, so in law and common sense there cannot be an express and an implied contract for the same thing existing at the same time.   This is an axiomatic truth.   It is only when parties do not expressly agree that the law interposes and raises a promise." *Walker* v. *Brown*, 28 Ill. 378, 383 (81 Am. Dec. 287).

So, plaintiff could not have an express contract with these three promoters that they, in consideration of his services in assisting to successfully accomplish the scheme, would make him the permanent attorney of the company, and at the same time have an implied contract with the company to pay him for the same services.  *Lyndon Mill Co.* v. *Lyndon Literary Institution*, 63 Vt. 581 (22 Atl. 575, 25 Am. St. Rep. 783); *Royston* v. *McCulley*, (Tenn.) 59 S. W. 725, 52 L. R. A. 899; *Thorp* v. *Bateman*, 37 Mich. 68 (26 Am. Rep. 497); *Boughton* v. *Boughton's Estate*, 111 Mich. 26 (69 N. W. 94).

In *Walker* v. *Brown*, S., assuming to act for himself and for defendants, made a contract with plaintiffs to perform certain work.   The work was done, but S. had no authority to bind defendants.   Thereupon plaintiffs sought to recover from defendants upon an implied contract for the value of the work, which was beneficial to them.   The court held that the express contract, executory in its provisions, totally excluded any implication of an implied one.

In *Lyndon Mill Co.* v. *Lyndon Literary Institution*, the defendant received the benefit of certain lumber furnished under an arrangement between some of the directors of the two companies.   The contract was a personal one between the directors.   Plaintiff sought to recover

from the defendant upon the ground that it had the bene-
fit of the lumber furnished, and that the law implied a
promise to pay.    The court held that the express contract
excluded any liability on the part of defendant.

In *Thorp* v. *Bateman*, Bateman made an express con-
tract with Thorp by which Thorp's infant daughter was
to live with Bateman until she became of age.    Bateman's
wife died, and Thorp then took his daughter away.    Bate-
man sued Thorp upon an implied contract.    It was held
that, if Thorp violated the express contract, "its existence
and the breach thereof cannot be the foundation for an
implied *assumpsit* of a wholly different character."

This is not the case of *Davis* v. *Strobridge*, 44 Mich.
157 (6 N. W. 205), where the vendor in a parol land con-
tract, which had become valid by part performance, re-
pudiated it, and the vendee was allowed to recover as his
damages that part of the purchase price which he had
paid, and the value of the improvements put upon the
land.

It is manifest from the record that the verdict was ren-
dered upon an entirely false basis.    The late Edwin F.
Conely, then living, and a witness for defendant, testified
to the value of such services as the plaintiff rendered.    He
was permitted on cross-examination by the plaintiff's
counsel to state what services such as these rendered by
the plaintiff would be worth upon the contingency that he
was to receive nothing if the scheme did not succeed.
Witness replied, "Well, I should say $7,500."    This is
the precise amount of the verdict, with interest added.
The motion to strike this testimony out should have been
granted.    Plaintiff could not recover upon the contingent
contract with the promoters, and therefore all evidence of
this contingency was incompetent, and should have been
eliminated from the consideration of the jury.

If the above views are correct, there would be no oc-
casion to discuss any other question.    But my Brethren
do not agree with me in holding that the plaintiff, having
made an express contract, cannot, under the circum-

stances, rely upon an implied one. It therefore becomes necessary to determine another question, which I proceed now to discuss.

The other important question raised is, assuming that plaintiff had a contract as claimed, was it performed on the part of the defendant by his employment for a year? When he entered upon his employment, and as well during the entire year, he believed that he was employed under his agreement with the three promoters; that the company had ratified that agreement, and that he was made the permanent attorney for the company. Upon this point he testified as follows:

"I received $125 a month, and receipted for it each month. I understood that I was to get $1,500 a year, and did not stop to inquire whether any resolution to that effect had been passed at all. I considered that I had an agreement for permanent employment, and did not need a resolution, and did not stop to inquire.

"*Q.* Did not inquire how the $1,500 had been fixed?

"*A.* I knew how that was fixed.

"*Q.* When did you first know that?

"*A.* The arrangement I had was to get $1,200 a year and $300. I was sworn on the last trial, and testified that $1,200 had been mentioned, and office rent, in the first year. The $300 over $1,200 was in lieu of office rent. That is the way I took it. I was content with that. I did not get any office rent from them.

"*Q.* Don't you know, as a matter of fact, the salary was fixed at $1,500 a year because your friend, Mr. Russell, had asked that you be employed one year at $1,500?

"*A.* I did not state what they say on the last trial—

"*Q.* Did anybody confer with you as to fixing the salary at $1,500 in lieu for your services and in lieu of your office rent?

"*A.* No, sir; they did not.

"*Q.* Simply began to pay at the rate of $1,500 a year?

"*A.* Yes, sir.

"*Q.* Never questioned it?

"*A.* Never questioned it. I thought they were carrying out their agreement with me.

"*Q.* Never asked why it was done, or what resolution was passed?

"*A.* I did not have to, because I had an agreement.

" *Q.* Answer the question, did you or did you not?

"*A.* I did not."

He also testified that when, at the expiration of the year, he was informed by Mr. Hawks that his services were no longer required, he told Mr. Hawks:

"I said, 'My arrangement with you was that I was to be permanent attorney for the road;' and he said, 'No such thing;' and I said there was; and I said, 'I made it to Mr. Angus and Russell.' "

Mr. Russell was not called as a witness by plaintiff, though he had no connection whatever with the company. Mr. Russell placed his construction of his agreement with plaintiff in the letter written to Mr. Hawks March 15th, in which he said, in substance, in consideration of Mr. Sullivan's doing preliminary work, he had agreed to give him permanent employment as attorney of the company, and requested that he be èmployed for one year at a salary of $1,500 per year. On the same day the directors met, and passed the resolution of employment, in accordance with the terms of that letter. This was the first notification to the company of the plaintiff's alleged agreement. Whether, under these facts, the resolution amounted to ratification of the agreement of Mr. Russell with plaintiff, it is probably unnecessary to determine. If the agreement was ratified, plaintiff's only remedy, as above stated, would be upon the contract for a violation thereof. *Hobbs* v. *Brush Electric-Light Co.,* 75 Mich. 550 (42 N. W. 965).

Upon the assumption that plaintiff had a binding contract for permanent employment, and was employed for one year at a salary of $1,500, which has been fully paid, counsel for defendant insist that this was a permanent employment within the true intent and meaning of the parties, and that it operated as a complete accord and satisfaction of his claim. Counsel for defendant cite in support of its contention *Louisville, etc., R. Co.* v. *Offutt,*

99 Ky. 427 (36 S. W. 181, 59 Am. St. Rep. 467); *Perry* v. *Wheeler*, 75 Ky. 541; *Elderton* v. *Emmens*, 4 C. B. 478; *Lord* v. *Goldberg*, 81 Cal. 596 (22 Pac. 1126, 15 Am. St. Rep. 82); *Roddy* v. *McGetrick*, 49 Ala. 159.

In *Elderton* v. *Emmens* the contract was identical with this, except that there was no contingency of success. It was urged that the word "permanent" implied an appointment, if not for life, at least for so long a time as the society should require the services of a solicitor and the plaintiff gave no cause for dismissal. The court took a contrary view, saying:

"Whether the expression 'permanent attorney and solicitor' means an employment for life, or so long as the company shall exist, or what, we have no means of judging."

The court held that it meant no other than a general employment, and said that, if it had been the intention of the parties to give the word "permanent" the sense contended for by the plaintiff, the agreement would have contained a variety of stipulations that were not found in it.

In *Roddy* v. *McGetrick* the plaintiff contracted for permanent employment as clerk for the defendant at a salary of $75 per month. The court instructed the jury, "If the employment was not for a month, a reasonable construction would be for a year, in the absence of a construction by the parties." This instruction was sustained.

In *Perry* v. *Wheeler* a clergyman was elected permanently to the rectorship of a church. The contract was held to be for an indefinite period, and terminable at the will of either party.

In *Lord* v. *Goldberg* it was "agreed by and between plaintiff and defendants that in consideration of his entering into their employment as such solicitor, and using all his efforts to secure certain named persons as customers, and to extend their business, they would give him permanent employment so long as he should use his best efforts to extend their business, paying him at the rate of $20 per

week, and increase his salary as the business increased."
It was held that such contract was for an indefinite time,
and continued only until either of the parties should wish
to sever the relation.   It further appears in that case that
plaintiff was in the employ of another party in the same
business, and that he gave up that employment under his
contract with the defendants.

In *Louisville, etc., R. Co.* v. *Offutt* the railroad com-
pany employed the plaintiff, agreeing to keep him in its
service so long as he did faithful and honest work.   The
contract was held terminable by either party at any time.

In *Texas, etc., R. Co.* v. *City of Marshall*, 136 U. S.
393 (10 Sup. Ct. 846), the railway company entered into
an agreement with the city of Marshall by which the city
donated to the construction of the road $300,000 and 66
acres of land in consideration that the railway company
"agreed to permanently establish its eastern terminus and
Texas offices at the city of Marshall, and to establish and
construct at said city the main machine shops and car
works of said railway company."   The company carried
out the contract by constructing its shops and establishing
its offices at Marshall as provided.   At the expiration of
eight years Marshall ceased to be the eastern terminus of
the road, and the company removed some of its shops.   It
was held that the contract for permanent establishment
was complied with by the establishment of the terminus
and the offices and shops contracted for with no intention
at the time of removing or abandoning them.   It was
there said:

" If the city desired to make sure that these establish-
ments should forever remain within the limits of the city
of Marshall, and that the railroad company should be
bound to keep them there forever, such an extraordinary
obligation should have been acknowledged in words which
admitted of no controversy.   It would have been very easy
to have inserted into this contract language which forbade
the company from ever removing the terminus of the road
to some other point, or from ever removing or ceasing to

use the depot or the car and machine shops, and thus have made the obligation perpetual."

A permanent abode is a home, which a party may leave as interest or whim may dictate, but which he has no present intention to abandon. *Dale* v. *Irwin*, 78 Ill. 170.

Permanent employment means "employment for an indefinite time, which may be severed by either party." 2 Bouv. Law Dict. Such contracts, in the absence of special considerations, conditions, and circumstances, are not construed to continue indefinitely, but are terminable at any time by either party. 20 Am. & Eng. Enc. Law (2d Ed.), 16.

The term "permanent employment" has, under special circumstances and conditions, been construed to mean continuous or indefinite employment, not terminable at the will of either party. Counsel for plaintiff cite and rely upon *Carnig* v. *Carr*, 167 Mass. 544 (46 N. E. 117, 35 L. R. A. 512, 57 Am. St. Rep. 488); *Stearns* v. *Railway Co.*, 112 Mich. 653 (71 N. W. 148); *Harrington* v. *Railway Co.*, 60 Mo. App. 223; *Pennsylvania Co.* v. *Dolan*, 6 Ind. App. 109 (32 N. E. 802, 51 Am. St. Rep. 289); *Carter White Lead Co.* v. *Kinlin*, 47 Neb. 409 (66 N. W. 536); *McMullan* v. *Dickinson Co.*, 63 Minn. 405 (65 N. W. 661, 663).

In *Carnig* v. *Carr* the contract was that if the plaintiff, an enameler, would give up his business, and enter that of the defendant in the same occupation, he would furnish him permanent employment at stipulated wages. After employment for several months, defendant discharged plaintiff, though he had plenty of work of that kind for him to do. The court said:

"To ascertain what the parties intended by 'permanent employment,' it is necessary to consider the circumstances surrounding the making of the contract, its subject, the situation and relation of the parties, and the sense in which, taking these things into account, the words would be commonly understood."

Applying this rule of construction, the court found that the contract meant employment so long as the defendant was engaged in the business of enameling, and had work which the plaintiff could do and desired to do, and so long as plaintiff was able to do the work satisfactorily. It was held not to mean life employment.

In *Stearns* v. *Railway Co.* plaintiff was seriously injured while in the employ of the defendant, and brought suit against the defendant for damages. The defendant settled with him by paying him $175, and making an agreement to employ him in the capacity of baggage master during his entire life or his ability to do the work. The basis of liability in that case was the surrender and cancellation of a claim against the company. Such cases are *Harrington* v. *Railway Co.*, *Pennsylvania Co.* v. *Dolan*, and *Carter White Lead Co.* v. *Kinlin*.

In *McMullan* v. *Dickinson Co.* the contract which the court sustained was in writing, and provided that the defendant should employ the plaintiff as an assistant manager; said employment to continue during the time of the business of said corporation, not exceeding the term and existence of said corporation, and so long as plaintiff should own and hold in his own name 50 shares of the capital stock, fully paid up, in said corporation.

Counsel for plaintiff seek to bring this contract within the above cases cited by them, for the reason that the plaintiff agreed to render some services for which he was not to be compensated unless the enterprise was a success; in other words, that he rendered services in consideration that he was to be made permanent attorney. Plaintiff gave up no occupation or business, as did plaintiff in *Carnig* v. *Carr.* On the contrary, he maintained his law business the same as usual, during the same time, at the same place, and in the same office. He gave up none of his other work. He released no claim and gave no past consideration for the contract, as was done in *Stearns* v. *Railway Co.* and similar cases. He did not agree to devote his entire time as a manager or assistant manager,

nor agree to hold any stock in the corporation, as did plaintiff in *McMullan* v. *Dickinson Co.* He had no claim for damages or otherwise to release, as did the plaintiffs in the other cases cited.   Immediately after his employment, he drew the articles of association, and the defendant was duly organized.   According to his own statement and theory of the contract, he then became the attorney for the defendant, with the understanding that, if the defendant secured the franchises contemplated, the company should make him its permanent attorney.   This employment, under his theory, dated from the organization of the company.   All the services to be rendered were services as the attorney for the company.   All the services contemplated and provided for were current and future services.   The life of the corporation was 30 years. Legal services would be required during the term of its existence.   It follows that this contract was either a contract binding for 30 years upon the defendant, or else it was terminable at the will of either party.   The contract is unusual, and it certainly should be made to clearly appear that the parties intended to make it.   If that was in fact their intention, they were singularly unfortunate in the use of language necessary to bind a corporation to employ a lawyer for 30 years.   It is significant that neither of the three persons with whom plaintiff alleges he made the contract supposed they were making such a one as plaintiff now claims.

If the clergyman in *Perry* v. *Wheeler* had agreed to preach four months upon trial, with the agreement that, if his preaching were found satisfactory, the church would employ him permanently, would that have changed the construction of the contract?   If plaintiff in *Roddy* v. *McGetrick* had agreed to work as clerk for four months on trial, with an agreement for permanent employment if his work was satisfactory, would the holding have been different?   If the lawyer in *Elderton* v. *Emmens* had agreed to do the legal work of the company for four months with the agreement that, if his legal services were

satisfactory, the defendant would employ him as permanent attorney and solicitor for the society, would the court have given a different construction of the word "permanent"?

I find it impossible to conclude that the parties who made this contract contemplated that the plaintiff was to be employed for 30 years, or as long as he was able to do the legal work of the defendant. I think the case falls clearly within the authorities first above cited, and that the employment under the above resolution was a full compliance with its terms.

The judgment is reversed, and, inasmuch as it is impossible for the plaintiff to make out any different case upon a new trial, I think none should be granted.

MOORE, C. J., MONTGOMERY and HOOKER, JJ., concurred in the reversal of the case upon the last point stated in the opinion.

CARPENTER, J., did not sit.