TANNER v. SINALOA LAND & FRUIT CO.

No. 2417.    Decided May 8, 1913.    (134 Pac. 586).

1. PARTNERSHIP—LIABILITY AS TO THIRD PERSONS—SCOPE OF FIRM'S
   BUSINESS. Where two of three partners, engaged in forming a
   corporation, to take over land on which they had an option,
   assured purchasers of interests therein that the partnership
   would attend to the detail work and bear the expense of form-
   ing a corporation to take over the land, such agreement was
   within the scope of the firm business and was binding upon the
   third partner. (Page 21.)

2. CORPORATIONS—CONTRACTS BY PROMOTERS—LIABILITY OF CORPORA-
TION—RATIFICATION. Where plaintiff, one of three partners en-
gaged in selling interests in a tract of land on which they had
an option and in organizing a corporation to take over such land,
prepared the articles of incorporation without any promise that
he would be paid therefor or without any assumption of liability
therefor by the directors, which service was more in the inter-
ests of the partnership than of the corporation, he must be as-
sumed to have rendered such services in pursuance of a repre-
sentation by his partners that the incorporation would be with-
out expense to purchasers, so that he could not recover there-
for against the corporation; since, while a corporation may
adopt the contracts of its promoters, especially those necessary
to effect its creation, promoters cannot, in the absence of any
adoption of their acts, bind the corporation by their contracts
made before it was incorporated.[1]     (Page 22.)

3. CORPORATION—SERVICE OF OFFICER—LIABILITY. Plaintiff, while
drawing a salary of $100 per month as general manager of a
corporation which he with others had organized to take over
land on which they had an option, was not entitled to com-
pensation for his services in preparing or copying a contract for
use by the corporation, since these services were such as a
business manager would ordinarily be expected to perform for
his company.     (Page 25.)

APPEAL from District Court, Third District; *Hon. M.
L. Ritchie,* Judge.

Action by H. S. Tanner, against the Sinaloa Land &
Fruit Company, a corporation.

Judgment for plaintiff.     Defendant appeals.

REVERSED WITH DIRECTIONS TO DISMISS THE ACTION.

*N. V. Jones,* for appellant.

*D. D. Houtz,* for respondent.

Statement of Facts.

H. S. Tanner, plaintiff herein, and two other parties, C.
D. Harding and J. M. Barlow owned and held an option on

---

[1] Wall v. Mining & Smelting Co., 20 Utah, 474, 59 Pac. 399.

a tract of land containing 4,338 acres situate in the State of Sinaloa, Republic of Mexico. These parties, preparatory to forming a corporation to take over the land at a price that would insure them a profit of more than $13,000 on the deal, solicited and procured purchasers each of whom purchased a small equitable interest in the option referred to in the bill of exceptions as "acre interests." At the time these various parties subscribed for and purchased interests in the option, they, in connection with the promoters Tanner, Harding, and Barlow, signed a written agreement referred to in the bill of exceptions as the "subscription list" which, so for as material here, is as follows:

"It is understood and agreed that said 4,338 acres of land represents 4,338 undivided acre parts, and that each undivided acre part free from incumbrance shall cost the subscriber $5.50, 50 per cent. of said amount to be paid upon demand and the balance to be paid in 60 days from date of this agreement. The undersigned hereby agrees that upon the completion of the subscription to the above acre parts a corporation shall be organized to receive and hold title to above said land, also to develop or sell said land for the benefit of these subscribers. It is further understood that upon the completion of above said subscription a meeting of the subscribers shall be called to elect the officers of the corporation and determine the purposes of the organization and the general nature of the business to be transacted."

In July, 1908, a corporation, defendant herein, was organized. Each subscriber to the foregoing agreement thereby became entitled to have issued to him shares of the capital stock of the corporation in lieu of the interests purchased by him in the land mentioned. H. S. Tanner, plaintiff, was sworn as a witness and testified in part at follows:

"There were in the neighborhood of 50 subscribers (for acre interests in the land.) * * * The land was turned over at $5.50 an acre. The compensation received by Mr. (H. S.) Tanner, Harding, and Barlow was $3 per acre. We sold the land to the company (corporation) at a flat acreage rate. We were responsible for the turning over of

the land to the company, and the company was responsible to us for $5.50 per acre."

The amount of the individual subscriptions for interests in the option varied from 10 to 300 "acre interests." Plaintiff retained 300 acre interests for himself, and when the corporation was formed he was made a director and also president of the company. Plaintiff, a short time after the incorporation of the company, was made its general manager. It appears that plaintiff, who is an attorney at law, assisted in preparing and drafting the articles of incorporation under and in pursuance of which the company became incorporated. Regarding the circumstances under which the articles of incorporation were prepared and drafted, plaintiff testified in part as follows:

"I don't know who it was that suggested that I prepare the articles, but it was suggested at the first meeting that I prepare them, * * * Submitted them to Mr. Jones (defendant's counsel herein), who was interested, to see if they suited him; and there were one or two provisions that he suggested some changes in; and also to Mr. Shipp (a stockholder in the corporation), * * * and he suggested some changes. I think Mr. Kimball likely made some suggestions. * * * Then I talked over these different provisions with various members, that is, the contemplated members of the company — the stockholders — to get their views * * * to see if the articles I had prepared met their views. And I drafted the articles some two or three times, and worked out the provisions in detail of different articles before they were finally acceptable to all concerned."

A short time after the company was organized and office rooms secured for the transaction of its business, plaintiff made out a bill of $250 against the company for legal services performed in preparing the articles of incorporation and placed the account on file with other bills of the company in the company's desk, and according to his testimony to which we shall refer later on, it was not presented to the company for more than three months thereafter. When the bill was finally presented to the company for payment, one

of the board of directors was absolutely opposed to paying it. The other four directors, of whom plaintiff was one, neither allowed nor rejected the claim, and its consideration was postponed from time to time, and finally it was rejected by the board of directors and payment refused on the ground that it was not a proper charge against the company. The board of directors some time in August, 1908, during the time plaintiff was president, general manager and a director, adopted for use by the corporation in its business a certain contract which it copied from a form of contract that seems to have been in general use in the section of the country in which the company was carrying on its operations and doing business. This contract was designated in the bill of exceptions as "guaranteed harvest certificates." For services rendered in preparing this contract plaintiff charged the corporation $50. He did not present this claim to the company for payment until a short time before the commencement of this action. The company refused to pay the bill or any part thereof. Plaintiff, on cross-examination, testified concerning that transaction in part as follows:

"Q. Now, isn't it a fact that Shipp and Kimball (two of the directors, one of whom, Shipp, was an attorney at law) did more in the preparation of these harvest share certificates than you did? A. So far as the certificates are concerned, they did the supervision of them. I simply did the legal work. * * * Q. Didn't you in fact think out, shape up, and form this harvest share certificate? A. No, sir; I did not. They used a general form of that from some other company. I do not remember now which it was taken from. * * * I made no claim to the conception of the form of that draft or printing, whatever you call it, on that contract. It was the legal work. * * * Q. As a matter of fact, Mr. Tanner, didn't you substantially copy, or cause to be copied, the form almost verbatim of the Mexican Rubber Company for this certificate? A. I rather think so. Q. Well, I put in your hand this blank form of Mexican Rubber Company's harvest share certificate and ask you to examine it and see whether the face of the contracts are not the same with a difference of the names. A.

It is practically the same. * * * Q. You were in the employ of this company—the defendant corporation—for a few months shortly after its organization and drew a salary as its manager, did you not? A. In the fall succeeding its organization I was manager and drew a salary of $100 a month as manager of the company for three months. Q. Did you ever make the presentation of either of these claims (referring to the claim for preparing the articles of incorporation and copying the contract mentioned) to the directors while you were manager and drew that salary? A. I did not. * * * Q. But no one ever promised to pay it (claim for preparing articles of incorporation), did they? A. No, sir."

Harding and Barlow, who were associated with Tanner in promoting the land deal, were called as witnesses for defendant and testified that it was expressly agreed between them and Tanner that no charges should be made against the prospective stockholders or the company when incorporated for any services rendered by them or either of them in organizing the corporation. And much evidence was introduced tending to show that plaintiff had but little, if anything, to do with the copying and the adoption by the corporation of the guaranteed harvest share certificates. This evidence was, in general terms, denied by plaintiff. The evidence, however, without conflict, does show that, after plaintiff, Harding, Kimball, Shipp, Jones and other prospective stockholders had decided upon the draft or form of the articles of incorporation, N. V. Jones employed at his own expense a Miss Dansie to copy (typewrite) them.

Some time in June, 1909, N. V. Jones succeeded Tanner as president and general manager of the company. The company, on or about November 1, 1911, levied an assessment of four dollars per share on its outstanding capital stock. This (the company's fourth assessment) was made payable December 6, 1911. Plaintiff owned 101 shares of stock. His assessment was therefore $404. He made a demand on the company that his claims for legal services above referred to, amounted to $350, with interest thereon from August, 1908, be allowed, and that the same be paid by giving him credit

for that amount on the assessment made on his stock. This the company refused to do, whereupon paintiff commenced this action. Before the cause was tried plaintiff's stock was advertised, sold, and bought in by the company for the assessment. Plaintiff thereupon filed a supplemental complaint setting forth the facts leading up to and which culminated in the sale of his stock as above stated. The relief prayed for in his complaint is "that it be ascertained, decreed, and determined that the defendant, at the time this action was commenced, was indebted to plaintiff in the sum of $444, and that the plaintiff is entitled to have so much thereof as is necessary credited against any demand the defendant may have against the plaintiff on account of the assessment levied on the capital stock, * * * and the said pretended sale of the said stock by the defendant * * * be set aside, and that plaintiff's title to said stock be declared and adjudged good and valid."

The court, so far as material here, found that plaintiff prepared "the articles of incorporation of defendant company, * * * and that said service was reasonably worth the sum of $250," and that he prepared the "guaranteed harvest certificate," and that "said service was reasonably worth the sum of $50." As a conclusion of law the court found "that plaintiff is entitled to judgment against the defendant for $380.13 to be credited and offset against the defendant's demand of $405.40 against the plaintiff." Judgment was rendered in favor of plaintiff in accordance with the prayer of his complaint and the foregoing conclusion of law. Defendant appeals.

McCARTY, C. J. (after stating the facts as above.)

Counsel for appellant contends with much earnestness that the judgment is not only unsupported by, but is contrary to, the evidence, and that it is against law. Viewing the facts in the light most favorable to respondent, they wholly fail to establish any legal liability on the part of the corporation for the services which he claims that he rendered it in preparing the articles of incorporation and the contracts mentioned in the foregoing statement of facts. We will first consider the

merits of the claim of respondent for $250 for services which he claims he rendered the corporation in preparing the articles of incorporation. The record shows that, after respondent Harding and Barlow obtained the option on the land mentioned in the above statement of facts, they, the three promoters, formed a partnership for the purpose of disposing of the option in small interests to prospective purchasers; each of the three partners retaining a small interest therein. Harding and Barlow did most of the soliciting for purchasers in their business ventures, and they represented to the parties whom they solicited and induced to purchase interests in the land covered by the option that the partnership, comprising Tanner, Harding, and Barlow, would attend to the incorporation of the company, and that each purchaser "would receive his stock without any additional expense." On this point, Harding testified: "The stockholders looked to the partnership to have the company incorporated. Q. How do you know they did? A. We represented it that way. Q. Who did? A. Mr. Barlow represented it." Mr. Barlow testified, in part, as follows: "I will further state that we so informed the members on that point; at least I did, and I am satisfied Mr. Harding did, because we worked together a great deal." And again he said: "I will state further that we so told these subscribers that they should secure their stock without any further expense."

It thus appears that at least two of the three members of the partnership agreed with a considerable number of the subscribers for interests in the land covered by the option that the partnership would attend to the detail work and bear the expense of forming a corporation to take over the land mentioned. This agreement being within the scope of the partnership business, Tanner, respondent, was bound thereby; he being a member of the partnership in whose interest the agreement was made. Respondent, in answer to the following question. "You three (Tanner, Harding, and Barlow), wasn't it a part of your plan and scheme to incorporate so as to turn the land over to the company and

thereby make your profit?" said, "That is what we did."
While respondent testified that he prepared the articles of in-
corporation at the request of some of the subscribers, parties
who had purchased interests in the land covered by the option,
and with the expectation of being paid a reasonable fee for his
services,he nevertheless admitted that no one promised him
that he would be paid for the work. Nor is there any
evidence tending to show that the board of directors, by reso-
lution or otherwise, assumed the payment of the obligation,
if it can, under the circumstances, be called an obligation.
There is a conflict in the authorities regarding the circum-
stances under which a corporation is or may become liable
for contracts entered into by its promoters before the corpor-
ation comes into existence. Some courts have held that
services rendered in the drawing and filing of the articles of
incorporation and the expenses necessarily incurred in its
creation are proper charges against a corporation, provided
the services were rendered and the expenses incurred with the
understanding and expectation that they would be paid for by
the company when incorporated. *Lowe v. Railroad Co.,* 45 N.
H. 370; *Farmers' Bank, etc., v. Smith,* 105 Ky. 816, 49 S.
W. 810, 88 Am. St. Rep. 341; *Freeman Imp. Co. v. Osborn,*
14 Colo. App. 488, 60 Pac. 730.

It has also been held that, in order to bind a corporation
by contracts made in its behalf before it comes into existence,
the making of such contracts must be authorized by at least
a majority of the promoters. *Bell's Gap R. Co. v. Christy,*
79 Pa. 54, 21 Am. Rep. 39; *Tift v. Quaker City Nat. Bank,*
141 Pa. 550, 21 Atl. 660.

The great weight of authority, however, holds that parties
who undertake to organize a corporation cannot bind the cor-
poration by their contracts and agreements made be-
fore the company is incorporated. The authorities,          2
however, practically all agree that a corporation may
by corporate action adopt the contracts of its promoters, es-
pecially those that were necessary to effect its creation. In
Cook on Corporations, section 707, the author says:

"Great difficulty has arisen in determining whether a corporation is liable on contracts made in its behalf by its promoters before the incorporation took place. The decided weight of authority holds that the corporation is not bound thereby. Any other rule would be dangerous in the extreme, inasmuch as promoters are proverbially profuse in their promises, and, if the corporation were to be bound by them, it would be subject to many unknown, unjust, and heavy expenses. The only protection of the stockholders, and of subsequent corporate creditors, against such a result lies in the rule that the corporation is not bound by the contracts of its promoters. The rule is just and should not be weakened. . . . It is entirely legal, however, for the corporation to ratify, confirm, or adopt the contracts of its promoters. A promoter's contract may be adopted by the corporation in any way in which a contract may be made by the corporation."

In 10 Cyc. 262, 263, the rule is stated as follows:

"Those who undertake to organize a corporation are not in any sense its agents before it comes into existence. They cannot affect it by their declarations or representations, or bind it by their engagements made in its behalf; but after coming into existence the corporation may make their engagements its own by express agreement or by ratification; and this ratification or adoption may be by express corporate action or by any of the other modes by which corporations may ratify or adopt the unauthorized or officious acts of others made in their behalf, as where the corporation voluntarily accepts the benefits accruing to it from the engagement of its promoters, after full knowledge, and having full liberty to decline the same."

In 1 Cl. & Mar. Pri. Corps. section 101a, it is said:

"Since a corporation has no existence, and cannot have an agent, until it has been created or organized, to such an extent, at least, as to become a corporation de facto, it necessarily follows that until then it cannot engage in business or enter into a contract. Its promoters are not its agents, and cannot contract for it. A corporation, therefore, when it has been organized, and has thus acquired corporate existence, is not liable upon a contract made by its promoters, or by agents appointed by them, before its organization, even though the contract may have been made in its name and with the understanding that it would perform the same, unless it has expressly or impliedly ratified or adopted the same since its organization, or unless liability is imposed upon it by its charter or by some other statute. It can make no difference in the application of this principle that the promoters who made the contract are the

only stockholders or members of the corporation; for the corporation, as we have seen, is a legal entity and artificial person distinct from its stockholders or members as individuals."

In *Tuttle v. Tuttle,* 101 Me. 287, 64 Atl. 496, 8 Ann. Cas. 260, this rule, which is a wholesome one and which rests upon sound legal principles, is tersely stated in the following language:

"A corporation is not liable in the absence of ratification or adoption or of a charter or statutory provision imposing liability, for the salary of a superintendent or other person for services performed for it before its organization under a contract made by its promoters, although the contract may have been made on its behalf and with the understanding that it should be bound, and although the promoters who made it have become its stockholders and officers."

This doctrine was recognized and followed by this court in the case of *Wall v. Mining & Smelting Co.,* 20 Utah, 474, 59 Pac. 399. See, also, *Long v. Citizens' Bank,* 8 Utah, 104, 29 Pac. 878; *Schreyer v. Turner F. Mills Co.,* 29 Or. 1, 43 Pac. 719; *Sullivan v. Detroit, etc., Ry. Co.,* 135 Mich. 661, 98 N. W. 756, 64 L. R. A. 673, 106 Am. St. Rep. 403; *Rockford, etc., R. Co. v. Sage,* 65 Ill. 328, 16 Am. Rep. 587.

We invite attention to a somewhat elaborate discussion of the subject found in a note to *Tuttle v. Tuttle, supra,* reported in 8 Ann. Cas. 262, where the leading English and many American cases are cited in which the doctrine as announced in *Tuttle v. Tuttle* is upheld. The annotators in their discussion of the question say:

"Prior to its existence a corporation can have no agents or representatives, and it would be impossible for a promoter to bind the corporation by contracts made prior to its incorporation. The courts of law have uniformly held that a corporation is not bound to perform a contract entered into by its promoters on its behalf and in contemplation of its organization. And the corporation afterwards formed will not be held liable in law on such contracts, unless there can be shown some intervening circumstances occurring subsequently to the incorporation that would impose the liability. . . . While a contract entered into between the promoters of a proposed corporation and third parties has no binding effect upon the corporation thereafter formed, yet it usually lies within the power of the corporation to adopt the contract and thereby to make, in effect, a new contract with such third parties."

Applying the foregoing principle of law to the facts in this case viewed in the light most favorable to the respondent, it necessarily follows that he cannot recover from appellant for services rendered in preparing the articles of incorporation. Moreover, the record affirmatively shows that there was no agreement whatever to the effect that the corporation should pay respondent for those services. And it further clearly appears that the purpose of these three promoters, respondent, Harding, and Barlow, in organizing the corporation, was, primarily, to create a purchaser for the land covered by their option. From the sale of this land to the corporation the partnership expected to and did in fact realize a profit of more than $13,000. Therefore what these parties did towards organizing a corporation was more in the interest of the partnership than it was in the interest of the prospective stockholders. In other words, the creating of the corporation, so far as they were concerned, was merely carrying out the scheme of the partnership by which it intended to and in fact did dispose of the land mentioned. And the undisputed evidence shows that in furtherance of this scheme respondent's copartners, Harding and Barlow, as an inducement to others to subscribe and pay for interests in the land covered by the opinion, promised these prospective stockholders that when the corporation was organized they should receive their pro rata of shares of the capital stock without cost other than the price paid for the respective interests. Therefore whatever service were rendered by respondent in organizing the corporation must be deemed to have been rendered in pursuance of that agreement, and under no rule of law can the services be held to be a proper charge against the corporation.

We are also of the opinion that respondent's claim for services rendered in the copying or having copied the "guaranteed harvest certificates" is as groundless as his claim for services rendered in the drawing up of the articles of incorporation. As we have pointed out in the foregoing statement of facts, the services rendered by him in preparing the certificates were rendered during the time he was president and general manager of the company. And

the evidence shows that during the time he was drawing a salary of $100 per month as general manager of the company at least a portion of the services was rendered. Furthermore, his own evidence, which we have set forth in the statement of facts, shows that about all respondent did in the preparation of the certificates was to see to it that copies were made from a form furnished by him by two of the directors. On direct examination respondent testified on this point as follows:

"I prepared these contracts; that is, the legal part of them. Mr. Kimball and Shipp prepared the form of the paper."

It thus clearly appears from his own testimony that the services were of the character that a business manager would ordinarily be expected to perform for his company.

The judgment is reversed. The admitted facts in this case absolutely preclude respondent from recovering anything from the corporation for the services alleged in the complaint or any part thereof. The trial court is therefore directed to dismiss the action. Costs to appellant.

STRAUP and FRICK, JJ., concur.